Case 14-5210 et al., United States of America, XREL, Robert R. Purcell, Appellant, Robert R. Purcell v. MWI Corporation. For Case 14-52, Ms. Patterson for the Appellant, Mr. McLaughlin for the Appellee MWI Corporation. And for Case 14-521A, Mr. Rhodes for the Appellant MWI Corporation, Ms. Patterson for the Appellee United States of America. And Mr. Aronica for the Cross-Appellee. Thank you. May it please the Court, Melissa Patterson on behalf of the United States. Hold just half a second, if you will. Of course. Good morning. Good morning, Your Honor. The government has appealed on the way that the district court offsets the trebled damages award here. We think the jury properly reached a single damages amount of 7.5. That the district court properly, under the False Claims Act, trebled that to 22.5. And where our dispute comes in, is in the way that the district court then applied an offset to that amount. What we think the district court did is improperly take payments that in no sense were repayments or reimbursements for the fraud here, and apply them as if they were. And I think it's helpful to run through the numbers here. The United States paid about $75 million to the descendants so that they would export goods to Nigeria. This is through an Ex-Im Bank loan. The jury found that 7.5 of that loan was due to MWI's fraud. That essentially 7.5 of that was fraud tainted. Now, ultimately, Nigeria ended up repaying those loans that MWI had gotten the United States to pay to MWI. So we got repaid one time for the 7.5 fraud tainted portion. But of course, in a False Claims Act case, you don't get repaid on the fraudulent amount once. The government is supposed to get repaid three times for trebled damages. And the delta there, between 22.5 and 7.5, that $15 million, is what no one has ever compensated the government for. And that's where we think the district court went wrong in wiping out that $15 million. Let me ask you, turning to the government's motion seeking reconsideration, are you familiar with that? Yes, Your Honor. The government states, and this is in the Joint Appendix at 401. This is the in limine motion saying that the district court had erred in allowing the defendants to argue that Nigeria's eventual repayment of the loan can reduce the government's damage. Yes, Your Honor. And the government states, the United States agrees that MWI is entitled to a credit for this payment.  And the court multiplies the damages. And you cite Bornstein. The court agreed with you. Agreed with the government. Yes, Your Honor. Haven't you conceded that at this very point? No, Your Honor. And in the course of litigation, it was very clear that we were not saying that the entire repayment would necessarily be considered. Did you get the sentence? I did, Your Honor. And if you go to the next page. The next page of what? JA-402, the next page of our motion. Yes. It says, and we're referring back to an earlier ruling in the case, Judge Armina found that any payments from Nigeria were compensatory payments that would be addressed by the court. Now, this is important. If you go to JA-388. Hold on. Tell me what you're quoting on 402. It's at the bottom of the page. And what we're making clear. This is just recounting what the judge had previously decided. Yes, Your Honor. And what the judge had previously decided and what we were trying to get now Judge Kessler to reinstate is that the issue of whether and how any compensatory payments would be applied would be applied after the jury had arrived at the actual damages. I thought the motion was to exclude this evidence. Yes, it was. So that the jury could not hear it. Absolutely. Because, as the government tells the district court, the United States agrees that MWI is entitled to credit for this payment. But, Your Honor, we never agreed to any particular amount. So at JA-388, we say the whole issue. Whether and how any, any, I'll get the exact quote here. Nigeria's repayment may entitle MWI to a credit. Where are you now? 388 where? JA, let me find me. I'm about halfway down the page. Okay. Nigeria's repayment may entitle MWI to a credit. But the court has expressly determined that it will assess whether and how such a credit is to be applied after the jury awards damages at trial. And then that's exactly the ruling we got. But if you look at JA-415, it says, this is in the first paragraph. But it's not the first full paragraph. If the jury in this case, applying the formula set forth in science applications, determines that the government suffered damages, the court will then decide whether MWI is entitled to a reduction in the final damages damage amount based on the amount of Nigeria's repayment. Now, I agree that the district court's opinion and the later opinion, I'll call the third published opinion, are not entirely clear. But look at 414. And the court is reciting the theory of the case presented by the government, citing science applications. And then it says, accordingly on reconsideration in light of Ornstein, the court now holds that the repayment is not relevant. Is not relevant. Was the district court in excluding the evidence on the ground that she was agreeing with the government that MWI was entitled to a credit for this payment, necessarily deciding the Ornstein issue? If you're asking whether she decided that every dollar in repayments from Nigeria was going to be applied as an offset, the answer is no. And that's clear from the next page on 415, the final paragraph. Remember, as of this time, we were reserving the argument that while you're supposed to take it into account on the back end under Ornstein, you don't take it into account under the calculation of single damages. You only take it into account as an offset after the jury comes up with that number. And the jury agreed with you on that. Right. And then we presented evidence. We thought that there was a possibility MWI was not going to get any offset because they had orchestrated repayment on this loan at the expense of other loans. So let me be clear. Under this position, then what was the basis for the judge excluding all the evidence with regard to repayment? This goes to the heart of our case, Your Honor, is that that's the proper way to think about a third party's reimbursement of fraud paid out monies. You think about it after you first calculate what the government has paid out. I'm the judge. The jury is about to hear the case, and the government files this motion for reconsideration, saying exclude all evidence regarding Nigeria's repayment of the loan. Yes. So if, in fact, some of the repayment was relevant, then was that ruling error? No, Your Honor. Remember, going into the trial, our argument, our theory was that every dollar United States paid to MWI was damages. We wanted $75 million in damages. Now, if the jury had returned a verdict of $75 million in damages, our theory would be identical, but under that theory, MWI would have gotten an offset of $75 million off a $225 million damages award. Our theory is we paid out $75 million. The jury said, okay, about 68 of that was legitimate. You would have paid it anyway, but about 7.5 of that was over and above what you would have paid but for the fraud. So we got repaid on the 68 million, which was essentially the legitimate part of the loan. We got repaid once for the fraudulent painted portion, the 7.5, but we never got paid three times. So we are willing to give MWI a credit of the 7.5. We acknowledge somebody else reimbursed us that fraudulent amount, 7.5, but no one has reimbursed us for the full treble damages amount. And throughout the litigation, we were clear that just the entire issue of how you take into account those third-party repayments, you deal with that after the fact finder, after the jury. Why, if it's not compensatory payments and, therefore, as a matter of law, put to the back end, why wouldn't that be relevant to damages, how much was repaid? Because we don't have anything to do with the fraud, Your Honor. The jury said, and again, we didn't know what number the jury was going to come up with. So under Born to… If they had paid nothing. MWI paid nothing? No, Nigeria. If Nigeria had paid nothing, that would also be irrelevant. We would still have litigated the case the same way. We're not trying to have it both ways. We're satisfied with the rule that whether the third party repays us or not, that's simply irrelevant to the jury's calculation of the damages award. Now, of course, if we didn't get any repayments, there would be no question of an offset on the back end. But our position is when you induce us, you, MWI, the defendant, and induce us to pay you a bunch of money, whether or not somebody later comes along and reimburses us for those payouts is irrelevant to the calculation of single damages. And all of the reasons the court recited in Bornstein, we don't want the advantageous acts of a third party. We don't want the fact that a third party comes to the rescue, which may or may not happen, to fix the liability under the multiplier. We don't want that to be the driving factor. Now, of course, we're not trying to get a windfall here. If somebody else, a third party, comes along and gives us back some of the money we paid out due to fraud, or even if they wanted to out of grace, if Nigeria had come to us and said, we understand that there's a $7.5 million damages award, we feel really bad, we understand we've only repeated it once, but here's a check for, you know, $10 million, we'd be arguing only for five. We're not trying to recover more than three times over, but we do get to account for at least that three times over. And I want to point out that the deterrence rationale that was so important to the court in Bornstein is even more important here because there, the fraudulent party, the subcontractor, it was going to be liable for the multiplied damages award in its entirety. The court noted that that fraudster, that subcontractor, is going to be liable to the contractor, the third party who made good to the United States in part. No one thinks that MWI needs to repay Nigeria that $7.5 million. Essentially, even under our theory of the case, MWI is only going to be on the hook for double damage. It's not the full troubled amount. But under Judge Kasper's theory, wrongdoers can evade the multiplied damages liability entirely. I might be interrupting in a different thought, but why didn't you say this to the judge in these motions? In other words, the repayment is not relevant at the front end or the back end. Oh, Your Honor, we definitely said they're not relevant at the front end. That was the crux of our debate. Or the back end. Your Honor, we did say that there was, again, there was a dispute about whether or not MWI had orchestrated Nigeria's repayment on these loans. So we reserved the whole issue. And the court at 415 makes clear that it was also just kicking that issue until after trial. We argued after trial that we thought – Judge Urvina's rulings, at least, I thought, correct me if I'm wrong, had indicated that those would be considered compensatory payments. I think that there was never any set amount that was going to be considered compensatory. And the court said whether and how – But as your motion said, Judge Urvina found that any payments from Nigeria were compensatory payments. And in context, in the course of this litigation, we were not committing ourselves to saying all repayments are going to be repayments. We give a hypothetical in that motion. We say if the jury returns about $75 million, then, yes, they would get a $75 million credit. But, again, at that point, if the jury had said, yes, all 75 paid out was due to fraud, we would have said, okay, we've gotten that $75 million back once, so we're going to give you a credit because the fraud, the repayments for fraud, not repayments on a legitimate part of the loan, have been returned to the United States. But you have not returned the trebled figure, the remaining $150. And so that's what we think is the key error. Now, we could not have known before trial what the jury's verdict was going to be, so we never committed ourselves to any particular amount. Here's what the district court says in her third published opinion. In footnote 9. I'm sorry, Ericka, you have a citation and I'll follow up. Page 60 of the published opinion brochure. I'm afraid I only have the original record citations, but I'll try to follow up. They put all, I thought it was very convenient, all the published opinions were put in one place. So this is the third one, part C. This is footnote. Footnote 9. All right, page 60 of this brochure. If you can find footnote 9 of the decision dated February 10, 2014. Can counsel assist counsel here? No, Your Honor, I think I can find it. I'm using the original record versions, but I think I'll be able to find it just fine here. Footnote 9. Nine. Here's what the judge says in rejecting MWI's claims that the government's judicially stopped. The judge says, quote, this court did not adopt the government's position that the Nigerian repayments were, quote, compensatory payments, quote, that would necessarily offset any damages. Yes, Your Honor, and we think that that was a mischaracterization of our position. Well, all I'm getting at is what we have is the government's written motion and we have the district court's statement as to how it understood that motion and what the government was arguing. That's the only point I'm getting at. And so it was a surprise to read in the government's brief, although the government may be right about this, that your position was only some of the repayments may be compensatory. Your Honor, I think if you go back to our actual motions. I do. And Judge Kessler's decision. But do you see the footnote 9? I do, Your Honor, and in our brief we noted that that characterization of our position, we thought was inconsistent with both our filings and we think it's inconsistent with the court's prior determination at JA 415 that whether and how MWI is entitled to a reduction, that will all be sorted out later. The judge actually says this twice. In the sentence I read and then there's another sentence. So the district court, you're suggesting, completely misunderstood the government's position. I think at that point the way she described it was not a fair characterization. And I don't think there's any legal theory. And what would have put the district court on notice that the government was arguing only part of the repayments may be compensatory? Following up on Judge Kavanaugh's question. Well, Your Honor, again, we were at that time reserving the argument that none of them, that to the extent they're considered at all, you consider them after the jury calculates damages. But our theory was maybe none of these are compensatory. But in your written motion you say that payment that MWI is entitled for credit. We also refer to any compensatory payments. We never said any loan payments. We never said all loan repayments. We're talking about compensatory. Remember, that's what you're getting at under Bornstein. But let's just go back. So MWI is selling pumps, right? Correct. To Nigeria. And they, in your theory, fraudulently convinced the government to give loans to Nigeria. Correct. And Nigeria repays the loans. Yes. What's the damage other than what's the damage? Your Honor, remember there are sort of two separate agreements the government has going here. The government has an agreement with MWI about what kind of commissions they're going to pay and what they're going to use our $75 million for. And so we pay the money to MWI based on those representations. At that point, MWI is out. They have no further legal obligations. Once they file their last certificate and get the last drawdown, they're done as far as the legal matter is concerned. Now, we still have a separate contract with Nigeria that says you need to repay us the money that we paid to MWI on your behalf. But these are, this really is a third-party payment. In cases talking about the benefit of the bargain, like this court science application cases, that case is not going to how you account for third-party reimbursements to the government due to fraud. And so we think the benefit of the bargain, the way you look at that is with MWI. But it's all these disparate transactions. Well, it seems to me, and maybe I'm misunderstanding, but it seems to me they're all linked up. And when Nigeria repays the loan, I'm having trouble seeing what's left of the damage. Maybe you can restate what you said before when I asked that. Well, Your Honor, of course, when the government, there's some suggestion in the briefing that Ex-Im Bank somehow works like a Wells Fargo, that all we're after is just the interest. That is emphatically not the case. This is a government entity that's fulfilling a larger programmatic purpose for the benefit of a third party. Without the fraud, you wouldn't have given the loan, potentially. Absolutely not. And there is testimony to that fact. Okay. But you gave the loan and were repaid. Correct. So the damage, therefore, is that you gave the loan and you didn't want to give the loan, but you were repaid on the loan. But that repayment, that third party revenue stream, that's a third party payment. Yeah, the legal terms of art we can get to, but I'm just trying to understand. We didn't want to give the loan, or we wouldn't have given the loan but for the fraud. We gave the loan and we got repaid fully on the loan. No. Your Honor, again, looking at the benefit of the bargain that way, we think improperly conflates MWI and Nigeria, and that there's a real difference when the party that you're working directly with repays you versus when a third party makes good. That real difference, if you're going to put it in plain English, that real difference is? I don't know if this qualifies as real English, but Bornstein. This is the setup the court was worried about in Bornstein. Party one defrauds you. Party two comes in and in some way makes good on that, makes good on the fraud. You still calculate. Yeah, there's still liability. I'm asking about damage. You still calculate the damages just based on what party one did to you. You don't take into account what party three did. But normally, if you're fraudulently induced to give a loan, you're mad about it because the person you gave a loan to didn't repay you or didn't repay you fully. But in this case, what we're mad about is that somebody lied to us about what they're doing with our money, and that part is MWI. Now, I want to note, even on the theory, there seems to be some suggestion that the jury should have considered this in the first instance in calculating the damages. This court's decision in science applications makes very clear. We get to argue to a jury that our larger programmatic interests were not fulfilled here. So even if the jury had been allowed to consider this information in calculating the actual damages, the single damages, we could still argue, listen, you took about $28 million of our dollars and you used it to fund a Nigerian agent, not to support American jobs. That's not what our program is for. Part of the reason that's not what our program is for is because we are not interested in using our money to support Nigerian agents, especially because it raises the specter of corruption, and we want nothing to do with corruption. And that's a good argument for a criminal sanction or for liability of some kind. But when we're talking about damages. But I think our programmatic interests here really were damaged. And this brings up the issue of a remand, which, of course, is not something they've ever asked for here. I guess I don't understand, and I don't want to prolong this, but I'm going to ask one more question. I don't understand why you say your damage would be the same if Nigeria repaid the loan or if they didn't repay the loan. And that's because the damage, when you're looking at damages, you just look at what the fraudster did to us. Now, we're not saying we get the same amount later. If we got repaid, you get a credit for it, but you calculate that on the back end. I understand that's Bornstein kind of bumping that to the back end, and you're saying not all of that gets bumped to the back end. Some of it doesn't matter at all. Well, some of it, under the jury's view of the case, some of it had nothing to do with the fraud. Remember, what we're talking about is compensation for the fraud, repayment for the fraud. Are the statutory provisions relevant to that? The statute simply says damaged the United States. The Supreme Court and Bornstein did. And why, then, isn't that relevant? Well, Your Honor, because it doesn't tell us how to calculate those damages. No, but I'm following up on Judge Kavanaugh's line of questioning. If you're totally repaid and you're talking about this programmatic damage, and Congress has said for programmatic damages, here's what the damage is, I mean, that's one argument. And I'm asking you, how do you fit that in to your argument that even though the statutory damages are recovered, there is additional damage, notwithstanding the full repayment of the loan? By statutory damages, you mean the penalty provisions, right, Your Honor, just so I understand your question? Yes. That was very much the case in Bornstein. There were penalties in that case, too, and the court still said we have to make sure that the person who does the fraud, that the damage they inflict is doubled. We need that multiplier. That's a key part of the deterrent scheme here. So penalties alone, the Supreme Court has indicated, are not sufficient to take care of this third-party problem.  I believe so, Your Honor. Because the offset was more than the troubled damages, which is not usually going to be the case, correct? It will not usually be the case. Right. But that is because I think people will usually recognize that when you've gotten to that position, that the offset is somehow more than the troubled damages, you may be taking into account as an offset something that didn't have anything to do with the fraud. And the repayment on the first $68 million, under the jury view of the case, that was a legitimate payout. So when we got our money back, that was not reimbursement for the fraud. So what is your strongest case supporting the district court's decision to exclude all the evidence relating to the repayment? We think that the clear application of Bornstein, Your Honor. That's what I thought you were going to say. That's what your motion said. And one other question, just factually. When the Export-Import Bank received the application for the loan, from whom, whose application was it? I believe there's paperwork you need from both Nigeria and EXIM. But the form that says we only pay regular commission is only done by MWI. So you think, can we find in the record that you said there were two separate contracts? I just want to be clear about this. Yeah. I'll have to pull the record sites maybe when I'm back at the council table. But there's a separate loan contract that's just Nigeria and the United States. All right. And then both the supplier certificates and the original loan applications are just between MWI and the government. That's my understanding of how the transaction is structured. All right. We're well over time. Yeah, we'll give you a few minutes for rebuttal. Thank you, Your Honor. Good morning. Good morning, Your Honors. May it please the Court. My name is Brian Tully McLaughlin, and I represent MWI in this matter. The government, in its appeal, conflates the injury from the submission of false claims with the suffering of actual damages. As this Court has recognized in both the Davis case and SAIC, the False Claims Act imposes two types of liability. The first is that a defendant who submits a false claim is liable for civil penalties, irrespective of whether the government shows any actual damages. Secondly, the defendant is liable for three times the amount of damages that the government sustains because of the act of the defendant, if any. As the Davis case recognized, there are some instances of fraud that did not result in actual damages to the government. And here we have one of those instances. The District Court properly concluded that ultimately there were no damages to the government because it had received the benefit of its bargain and had been made whole by its receipt of full repayment of the loans it issued, pursuant to the terms of those loans, as well as earnings of $34 million in interest and fees on top of it. Nevertheless, the District Court recognized that false claims had been found, and so to compensate the government for any intangible or non-monetizable harm, it assessed the maximum amount of penalties available. And that was the proper result here. Well, you heard all my questions about the usual stuff. If you want to respond to the government's position, basically is that we're talking about apples as to exclusions and oranges as to the calculation of damages. Certainly, Your Honor. And basically, I think the assumption of that argument is everybody understood that in the District Court. And I would disagree with that. I think what was understood was that the government sought to exclude all payments towards the loan, and it didn't provide any qualifiers as to what would or would not be relevant as an offset. And beyond the documents I've cited in the record, do you have any other documents to support that position? One that I think is in the same document that you cited, Your Honor, that I think is important to point out, and it's at JA402. And this is, again, just going back to, I think, the same paper submitted by the government that you were focused on earlier. And here, just as in other places, the government, referring to Judge Urbina, stated that Judge Urbina found that any payments, plural, from Nigeria were compensatory payments. So the reason I point that out is because they said any payments. There's no qualifier there. That means all of them, any and all. There's no other way to read that language. But what about the government's argument that, you know, the False Claims Act is trying to get at something else as well, and the Export-Import Bank is not simply leveled cargo. It has another mission involved as well. And Nigeria got this, or you got the money through this loan, and had the government known that there were fraudulent claims and fraudulent statements, it would have denied this application and given the money to someone else. I mean, I don't know enough about the congressional appropriation process here as far as the Export-Import Bank is concerned, but I assume, you know, it's not a bottomless pit where it just has money that. So, you know, if we approve what turned out to be a fraudulent loan, it's no loss to anyone. I agree with you that the Ex-Im funds are not, they do have limitations. And in terms of that, whether there was a programmatic harm of any sort, that was something that the government had every opportunity to prove and to quantify to the jury, and it failed to do so. Well, I mean, it did to the extent of $7.5 million, all right, and then the statutory provision kicks in. I disagree, Your Honor. What the government asked the jury to do was to find the amount, as it states in its appeal brief, over and above what it would have paid, but for the false claims. That's what the jury was asked to do. And as SAIC dictates, that's only part of the damages calculation. So the first part is to calculate what's the amount over and above that the government wouldn't have paid but for the false claims. But the second part is to then consider what was the value received by the government in spite of the false claims. And that was not something that the jury was permitted to do. The court then did it post-trial by applying the undisputed value, which is tangible money, so that that was received by the government in this transaction on these loans. That's the benefit of the bargain analysis. And it matters not that MWI itself did not make the payments. What matters is that this transaction was for loans to be paid out and the value and the government here, unlike in some cases where you do have a pure third-party beneficiary case in which the government pays money and pays money to a contractor to go provide services to a third party. Here, the government wanted something for itself. The bank said, you can benefit these third parties with your sales, but we want something back. We're giving you a loan. We're going to get it paid back, and we should earn interest and fees on top of it. That makes this a very different case. The government says, though, that the compensatory benefits or payments referred to in Bornstein are compensation for the fraud. Do you want to respond to that? Sure. I would say a few things in response to that, Your Honor. First of all, the payments are ones that were, as I think Judge Rogers just pointed out, were considered by the district court to be compensatory payments. And so in that sense, we can't turn around and now call them something else. They have to be applied. Well, okay. Go to your next point, then. We got that point, but what about the argument that that's still not, regardless of what was said to the district court, put that aside. This is not compensation for the fraud. This is compensation under the terms of the loan that was not meant to compensate for the fraud. And, therefore, is not offset. The money here is compensating the government for what its damage could be in the loan context. And in that sense, where you have a loan, the most obvious form of damage would be by a default. Here, the payments that are made serve the purpose of precluding the government from having any damage from that, and that's why they are relevant in the sense that they compensate the government for any potential damage there. More importantly, the real point is that this is a case in which there was no damage. There was nothing to compensate the government for because it already received, pursuant to the terms of the loans, all of the money it had loaned out. What about the Supreme Court's concern about perverse incentives in Bornstein? The District Court took that concern into account in a couple of ways. First of all, as I mentioned, the District Court here specifically referenced, in its damages opinion, that civil penalties are available under the statute and that they must be applied. And the District Court reasoned that, given the fact that there are potentially other costs to the government that may not be monetizable, that penalties were appropriate at the maximum amount and that those serve a deterrent effect. MWI here is not getting off, as the government argues, scot-free. MWI has been found liable under the statute. It has been suffering, I would say, for over a decade now from the ramifications of that, and it will continue to have that judgment against it, subject to the cross-appeal. It also has to pay penalties, and that's what the courts recognize is appropriate, even where there are no actual damages suffered. The other point I would make is that that's exactly what Bornstein and other Supreme Court cases have said, that it's not just about the travel damages but the fixed sum of a civil penalty that compensates the government overall for any loss, monetizable or not. I wanted to note, just to make sure I wrapped up on the judicial estoppel point, Your Honor, that a point was made about there's a disagreement from the government concerning whether there's a confusion between the parties and the District Court about what was met. But what's important here is that the court didn't just say that it agreed with the government. It said expressly that Bornstein is directly applicable to this case, and that was the basis of this entire ruling. The court said MWI does not cite any case to distinguish loan payments from compensatory payments. And also reason that there is no logical relevance between that. That was the holding of the District Court, and that's why because there is no other basis for the District Court to exclude the payments other than holding that they were all compensatory, they must be considered so at this point. Bornstein is an interesting case because you both cite it. You both rely on it pretty heavily. My question is if we follow what I think is your argument, then don't we end up with exactly the problem that Bornstein was concerned about, which is this adventitious action of third parties where you get different results from where exactly the same thing has occurred, and what happens depends on whether some third party pays something back or not. I appreciate your question, Honor, and that's not a problem here. Here, what Bornstein, what the Supreme Court recognized and was concerned with in Bornstein was that prior to any traveling or doubling at that time of damages, that a third party's payment could then wipe out everything. So the Bornstein rule and calculus was as follows. You assess the damages, you then travel them, again, double them at that time, and then you would apply any payments from third parties that are relevant to that transaction. That's exactly what the District Court did here. The Bornstein Court didn't say that the payments after traveling, when applied, couldn't offset single, double, travel damages. It just said this is the calculus that has to be done. And one important thing in that regard that Bornstein also said is that the purpose of all this is to make sure that the government is made whole. But it's not to make sure that the government is made more than whole. And here, that's what happened. The government was made whole. It may not have wanted to make these loans, but as the Ninth Circuit recognized in U.S. v. Woodbury, even if it had wanted to hold up some payments or not make them, it ultimately did and it got the security that it bargained for, plain and simple. And that's why there is no damage here. And U.S. v. Woodbury is one of the cases we cited as a no damages case. Very similar in that regard. The other thing I would note, incidentally, in the Bornstein case, is that that case was then to be remanded. And in footnote 13 in Bornstein, the Supreme Court made clear the benefit of the bargain analysis that we say governs here, which is that in that case, the government had retained the defective tubes that it had received. And in the damages calculation that went up to the Supreme Court, the value of those defective tubes retained had not been considered, in part because the lower courts had been improperly applying the prime contractor's payments. I should ask you a question. Sorry to interrupt. The damages here are separate and apart from what happened with the loan itself. And then the damages are trebled. As a matter of logic, why should what happens with the loan offset damages that were separate and apart from what happened with the loan? I think the problem with that is that I think the premise, which is that there's damages. The jury's- Well, the jury found damage of 7.5. What was that for? What the verdict shows, in some sense, I'm not sure that I can really make sense of it. But it's got to be something other than the failure to repay the loan. Because that evidence was not part of the case, having been excluded, correct? I agree with that. Okay. So then that damage has nothing to do with the loan repayment or not, and then it's trebled. Why would what happens with the loan offset damage that had nothing to do with the loan if the loan repayment is not part of the relevant evidence in the case? The verdict of 7.5 million does not represent actual damages to the government. The reason is because the only thing it represents is the amount over and above that the government wouldn't have paid but for the false claims. What the verdict does not represent is balancing that against the value that the government received from the transaction of making the loans. And therefore, the actual damages are putting those two things together, and that's why there's no damage here. All right. Anything further? I just wanted to make a couple final points, Your Honors, just to talk about kind of the public policy issues here. Here, the difference from so many of these loan fraud cases is that the loans were repaid in full, and the government here is seeking to punish MWI in such a case where the loans were repaid by their terms. Now, I just think it's important to think about why the government sought to exclude those payments in the first place, and the reason is clear. Because the jury would have awarded zero. Exactly, because the jury would have seen that there was no damage. Conversely, though, if the loans had not been repaid in full or in part, I defy the government to stand here again and say that they would not have pointed to the default on the loan as damage and quantified it based on the amounts it had not received on those loans. That is what happens in the typical loan fraud case. Again, this is a very different case. I think one further point that shows that there can be no real dispute about that is that there were common law claims led by the government in this case, and upon learning that the court was going to permit repayment evidence to be given to the jury on those claims, the government made a decision to dismiss them with prejudice. That is a recognition that there would have been a very different finding were that evidence to be considered, and the government seems to have a position that because it's preceded under the False Claims Act that the damages should come out differently, and that's just incorrect. So the last point I would make is simply that the ultimate question in this case really is, does the government suffer any damages when it loans money that's fully repaid pursuant to the terms with earned interest and fees? The answer on this record is no, it does not. Thank you. Counsel for the government, you have a couple of minutes. Thank you, Your Honor. Following up on our earlier discussion, you had asked for record citations about the separate agreements here. So starting at JA750 is the loan agreement signed only by Nigeria. The signature page is at JA783, just the government and Nigeria. And then at JA784 is an example of one of the fraudulent certificates. Thank you, I found that. At 784, and it's signed only by MWI and the government. I just want to note that the last words by MWI's counsel were that the government suffered no damages. Now, of course, the jury said we suffered $7.5 million in damages, and if you wanted to overturn that jury verdict on the theory that they should have thought about this loan repayment evidence, that it's really part of the benefit of the bargain and that they should have been able to have it before them and thought about it in calculating those actual damages, what you ask for is a remand, which defendants here have never asked for. Remember, they put their complaints about the benefit of the bargain in this part of the case, in the appeal. Of course, if they wanted to expand their relief, they needed to cross-appeal on that issue. So why any offset at all from the government's point of view? We do think that on this record, the way that this case was litigated... What's your theory for why an offset is allowed? ...at all is because if we paid out $7.5 million due to fraud, which is what the jury said, $7.5 over and above, and we got it back once, we're willing to say that can plausibly be described as compensation, as reimbursement, one time over, not three times. No, when you got it back once, how did you get it back once? When Nigeria repaid it. So then they repaid it once, and we are conceding that they get a credit of $7.5. They repaid it as part of the repayment of the loan. Yes. But your theory of the case, I thought, was that the loan is distinct from the damages that the government may or may not have suffered. Your Honor, we agree that loan repayments can be compensatory, just not that they're always compensatory.  It seems like the pure argument, which also I realize why you might not make this, but the pure argument would be there should be no offset at all because the repayment alone is irrelevant to the damages that the jury found that the government suffered here, and therefore you should trouble those and just ignore the repayment alone. Your Honor, I think if we said that you don't take loan repayment into account on either end, either the front end or the back end, we really would be seeking a windfall, and we've never sought to do that. We think you have to take it into account once. We think the right way is on the back end, but a lot of what opposing counsel was up here saying suggests that there shouldn't have been any single damages at all. But then doesn't the troubling become a penalty rather than damages? No, Your Honor. The Supreme Court explained that the reason we multiply, Congress multiplies, is to compensate the government for the more inchoate harms of frauds in its program, as well as to deter people from doing it. If you just wait until you get caught and you pay it back, that's no deterrence. Right, but then why not offset at all? Because, Your Honor, all we're talking about, it's not all due to the fraud. Only the 7.5 was repayment for the fraud. That's the amount the jury, and again, we respect the jury verdict here. The jury said only 7.5 of this was tainted by fraud, and so on that view, using what the jury told us, that's how we get to the theory that, all right, fine, you get 7.5 credit, but you don't get the extra 15 million. So the 108, if I have that figure right, that the jury repays, does compensate for the 7.5, but doesn't compensate for the 15. I think that's right, Your Honor. Remember the 108 gets to the interest on this loan? Yes, okay, well, whatever amount is repaid, which is more than 22, it properly offsets the 7.5, but doesn't properly offset the troubling amount, which is the extra 15. Because you have to look at what part of that 108 can, in any sense, be described as reimbursing the government for the fraud. We know how much the government would outdo the fraud here. But the 15 is for the fraud, too. It is. It's the inchoate harms and extra harms and hard-to-calculate harms that Congress wanted to put in there. It is, and it's very clear that we get those. I do want to note that this idea that loan repayments count as offsets, not as part of the benefit of the bargain, is not new. The Supreme Court itself cited two district court cases, Logan, Madeline, and Klein. They were both loan cases where the government had later gotten some payments from the innocent third parties. And the Supreme Court described those as offsetting credits. But, of course, it has to be a credit. It actually has to be compensation. It can't just be something you did that was not related to the fraud there. Yes, so that's why. It's like taking if you. I think I understand why you argued it the way you did. But the concession, if I can use that word that you've made, is a bit inconsistent with your theory, I think. Well, maybe let me see if I can say this in a different way. Would it be correct to say that the government's position is their argument was perhaps the entire loan was fraudulently induced? Right. But for those all certifications, you might not have made any loan. But the jury found that they decided you probably would have made it, just perhaps not as much. I think that's entirely right, Your Honor. I see I'm way over time. I do just want to note, if what we're talking about is saying the jury got it wrong in the 7.5 and actually they should have reached, they should have heard about this loan or payment, you would have to remand, which is something they've never asked for here. You don't just get to it. We want to be clear, I think. Our questions are going to trying to understand the government's theory of the case. Yes, Your Honor. And the way it litigated it in the district court. And I thought that's what Judge Brown's question was trying to be helpful in explaining. And you said yes. So you just adopted it. I just want to be clear. I do. And I think that the way Judge Brown articulated it is correct. Our theory of the case was that all of the loan was fraudulent. Every dollar we paid out was fraudulent. So this was argued to the district court. I just want to be clear about this. I'm trying to find this argument. Because when I read the district court's opinion on this issue, the district court doesn't avert to any of this. Maybe it decided it just wasn't. But that's not the way the opinion reads. And the district court says she looked at authority. And all of the cases are treating and interpreting Bornstein the way the district court did here. And I understand you're saying the district court was wrong. But I'm trying to understand where this argument is set out for the district court. Judge Brown offered one suggestion. And where is that? Is that even in the government's brief? Your Honor, yes. If you look at page JA402, the government sets out a hypothetical. Remember, this is before trial. And we set out a hypothetical very much in line with what Judge Brown was saying. Our theory, going to trial, I mean the first full paragraph was, we said consistent with Bornstein and Globe remodeling, if the jury finds, for example, the hypothetical, that the United States paid out $74.3 million because of their false statement, i.e., if everything we paid out, single damages would be the $74.3, if the court troubles, $62.9, then the court would apply any potential offsets for payments Nigeria made towards the $70.43 million loan. So if we paid out, if all $75 we paid out was fraudulent, then when you pay us back that $75, you can fairly say that's reimbursing us for the fraud. But that was a hypothetical. We were never saying that no matter what the jury came back and said was due to fraud, that we would somehow consider repayments that were for loans not fraudulently obtained, compensation for payments that were. The court has no further questions? Thank you. All right, turn it to the cross with you. Yes, Your Honor. May it please the court, my name is Robert Rode, and I represent the appellee and cross-appellant NWI Corporation, and I will be presenting this morning on our cross-appeal issues. I'd like to begin by saying that at its core, this is a case that really involves fundamental notions of due process, and whether my client, NWI, should be held liable under the draconian sanctions regime of the False Claims Act, or simply interpreting a term on a form from the Export-Import Bank, where the Export-Import Bank, or XM as we refer to it frequently, never provided any definition in statute, by law, by regulation, by any written guidance, or by any convention at the time. What NWI did was they were asked to report any commissions other than, quote, regular commissions or fees paid or to be paid in the ordinary course of business to our regular sales agents or sales representatives and readily identifiable on our books and records. Your hurdle, initial hurdle here, which is not insurmountable, but your initial hurdle is that these arguments could have been and were presented to the jury and the jury found otherwise. So how are we supposed to deal with that in your view? Yes, Your Honor, there's multiple levels. And by the way, I did reserve five minutes for rebuttal, and I just wanted to make that clear on the record. But there are multiple levels to that analysis. The first of which is that the case member should have proceeded to trial in the first place. Judge Urvina should have granted summary judgment. This was a clear question of law as to whether under due process requirements, for example, the agency had set a clear standard for which NWI could comply or not comply. I think the question for us now, though, is whether a reasonable jury could conclude that your interpretation of the term regular commissions was not reasonable. Yes, Your Honor. I think. Correct me if you think that phrasing of the question is wrong. Well, I won't correct you on your phrasing of any question. No, but the issue before us, is that the right way to look at the issue? Would a reasonable jury conclude that your interpretation of regular commission was not reasonable? I don't believe so, Your Honor, respectfully, because the case of Feld v. Feld, which this court issued, made very clear that if there is a pure question of law at the summary judgment stage, it is reviewable on appeal, regardless of what happens after, and there is no need for a litigant to put forward a Rule 50 motion at trial to preserve that issue. But isn't that the question at summary judgment, too? Yes, Your Honor. And in our view, the issue. The question that I asked, isn't that the question, in essence, at summary judgment? It is, Your Honor, except in here, what we have, though, is a clear question of law. That is whether or not there is a fair notice to MWI as to what this standard was, this previously undefined standard was. What do you do with our decision in K&R where the question there arose in the context where there was nothing more than the statement? And here the argument is, well, there was evidence presented, arguably, from which a reasonable jury could find that there was sufficient warning to your client. So, Your Honor, you raise a good point, and we actually rely heavily, as you know, from our briefs on the K&R partnership decision, which is memorable, not least of which is for Judge Brown's opening statement quoting Jimi Hendrix. But the issue there was, if there is more than one reasonable interpretation of a regulatory requirement, it cannot, as a matter of law, invoke FCA liability for purposes of the CNTR requirement. There is an issue, and the Supreme Court in Safeco, which is the decision really that K&R adopted and applied to the FCA context, explains that it really doesn't matter what the motive or the intent was. As long as there are one or more reasonable interpretations of a regulatory provision and the defendant adopts one of those provisions, there can be no CNTR, there can be no FCA liability. And I would note that in Safeco, it's interesting because that was a case where there was actually evidence where the defendant may have been warned away from its interpretation of an ambiguous regulatory term. In that case, it sought and received the advice of counsel at the agency who actually advised them that the position that they were taking would not be the most prudent position to take. Nonetheless, the court said that that's not authoritative guidance because it didn't commit the commission. In our case, there is none of that. What we have is we have MWI, which is a good company that had been in existence for nearly a century, four generations of a family, that had never been in trouble before, that had worked with the same agent in the same geographic region, selling the same sales, selling the same products both through private deals, through governmental deals, and even a prior deal in which the loan was backed by the Export-Import Bank where it was paying the same range of commissions. There's no dispute about that. Those facts are undisputed. MWI, for 12 years prior to this deal, was paying the same agent in the same country for the same products, the same commissions, and informed by that experience and looking through that lens, they of course deemed what they were paying the agent for these deals to be regular commissions as that term was laid out in the form. So your position is it wouldn't matter what evidence might be available absent a formal adoption by the agency of what it meant by a particular term? In essence, yes, Your Honor. What I would concede is that if there was information that would have clearly warned MWI away from its interpretation, that could have a bearing, at least as to the scienter element. Because that's what I was going to get at. The district court emphasized that, didn't it, that here we're talking about economic regulation, we're talking about the requirement that the action be done knowingly. Yes, Your Honor. That's what they had a general understanding of that. But I think they ultimately failed, if we want to fast forward. To the jury instruction on knowledge, for example, it said specifically it was an error in our position and we preserved our objections. But it basically said that the fact that you may, this is as to knowledge, and I apologize because I don't have a JA side to this, but it was the jury instruction provided. 713. Thank you, Your Honor. The fact that you may conclude that MWI had a reasonable and or good faith interpretation does not require you to conclude that MWI did not act with actual knowledge, deliberate ignorance, or reckless disregard. And our view has been and has always been that that's clear error, that's in contravention of the law. Have you challenged that jury instruction? We did, Your Honor, at multiple levels. So at first. In your brief. In here. In your appeal. We challenged the issue of the finding of knowledge. I can't commit to whether we actually specifically challenged it in our brief, Your Honor, to be candid. You mentioned it, but you don't have a separate challenge. You're not asking for a new trial based on an improper jury instruction. No, no, no. What we're really saying is that we can talk about the trial a lot, and there's a natural tendency and, I think, desire to want to talk about it, because that's what a jury actually heard, that's what a jury actually had. I get that. What we're talking about, though, is the issues of due process, falsity, and scienter are really involved pure legal questions of law for which the facts that are involved were never in dispute and should have been resolved in our favor at the summary judgment stage. That's what I thought your argument was, and that's why I asked you the question. So your position is that if an agency has a standard, and the standard is ambiguous, until the agency formally adopts a position as to the meaning of that standard, there can be no liability under the False Claims Act. Yes, I think that's right in the sense that, first of all, we would say that they never had a standard. It wasn't like they had a standard and it was ambiguous. Well, I'm saying regular commission is their standard. Go ahead. But you would have to acknowledge, I think, that there may be interpretations, even of an ambiguous provision that would be outside the range of reasonable interpretations and thus still proper for liability. Yes, sure. And that really is the question here, I think, which is I take regular commissions to be ambiguous. My question first is whether your interpretation of it was outside the range of reasonable interpretations of it, and then second, how I factor in what the jury did here. Yes, Your Honor, so that's a very fair point. But just because it's ambiguous doesn't mean you win. I'm just before you. So our first position, again, goes back to the due process and the Trinity Broadcasting decision, which was that even, and we don't agree that the court should have, but even if the court did give deference to the Export-Import Bank of its post-talk litigation fresh interpretation of this term regular commissions as being an industry-wide standard, that's fine. That doesn't change the fact, as this court found in Trinity Broadcasting, that there still has to be fair notice to the parties that are governed by that regulation. In this case, there's no dispute that there wasn't. There was never a definition in law, statute, regulation, agency matters, convention. Okay, let me understand what you mean when you say that's fine. What do you mean? What I'm saying, Your Honor, is that we can concede that the Export-Import Agency should get this high level of deference that this court acknowledged in Trinity Broadcasting to interpret its own regulations and to create a definition. That's one of two steps. All right, that's why I asked you the question I asked you. I need to just be clear about this. I thought your first point was the agency never articulated any standard under this phrase regular commission. That's number one. Yes, Your Honor. And just because some staff person mentioned it and said they had this understanding, that's insufficient under our cases. That's actually not right. I thought that was your first argument. Then your second argument was even if this new litigation position is the interpretation that is deference, your client still should prevail because there was insufficient evidence of... Fair enough. Yes, so, but the actual... Is that your argument or you say I'm wrong and I need to be clear what your argument is? Yes, Your Honor. So, our argument is there has never to this day been any definition articulated by the Export-Import Bank as to what regular commissions means or as to what the other terms on this certification mean. It was only during the course of this litigation, a decade after the events in question, that the Department of Justice, not Ex-Im, the Department of Justice came forward and had proffered the court with its new industry-wide standard as the definition for regular... But your argument needs more steps, which is and then your interpretation at the time was reasonable... Yes. ...under all the circumstances and history of commissions case. That's exactly right, Your Honor. And our interpretation at the time, which was that NWI, informed by its experience, interpreted the term to mean commissions paid that were commensurate with what it had paid its regular agent in the same geographic area selling the same products... Do you think a commission paid historically to one agent makes it a regular commission? It all depends if that's the market. And the Kafkaesque element of this case is that the government proffered this industry-wide standard, never really told anyone what the industry was. Does that mean selling pump products in the United States, abroad, sub-Saharan Africa, Asia, Europe, just everywhere around the world? Does it mean patented pump technology, commodity pump technology? They never articulated that. And we made the argument, as Judge Kessler acknowledged in the Rule 50 proceedings, that the government went out of its way to create this standard, but then never presented a scintilla of evidence as to what the industry standard is. Now, this line in the jury instruction that you quoted killed you.  What line is it? There's a line in the jury instruction that the fact that you may conclude that MWI had a reasonable or good faith interpretation does not require you to conclude that MWI did not act with actual knowledge or deliberate ignorance or reckless... Yes, it did kill us in the sense that there is ample evidence. Because if I'm a juror and I hear that, I think, well, they might have had a reasonable interpretation, but the judge told me not to worry about that. That's exactly right, Your Honor. And, again, this is really, in our view, an issue about what happened at summary judgment and clear error in conclusions of law that were reached based on undisputed facts. But, yes, when it did get to the jury, that didn't help. We had ample evidence, and the record is undisputed, that MWI has been a family-owned company that has been in for generations for over a century and has never been in trouble. They do good, they do well by doing good. That doesn't help. That's the first time for everything. Yes, I agree. But I would note to Your Honor's question, though, these are just a few of the things that Judge Urbina had to say about this issue because it goes back to your question, Judge Kavanaugh, which is we can all agree that there can be some interpretation of a regulation that is so outside the bounds that it's unreasonable and, therefore, doesn't deserve kind of the due process protections or the proper analysis under falsity. Suppose they had paid him three times his commission historically paid in this case. Would that be a regular commission? I don't believe so, no. How about two times? Look, they paid him within 1% or 2% below or above what they had paid him in the 12 years prior. And, again, this was on private deals, governmental deals, and even one large deal that was also backed by Exim. Can you explain? I understand your historical argument. You also have another argument about the formula. Can you spell that out a bit? Sure. So there was basically one of the things that Judge Urbina said is that there are – he said things like, oh, there are a plethora of explanations or definitions, and he specifically looked at three potential, what he viewed, I think, to be reasonable interpretations, which was that the standard could be industry-wide, intra-firm, or individual agent. And I think MWI's interpretation would be a combined version of both the individual agent and the intra-firm. I thought he said the word regular was inconsistent with historical. He did. And you were relying on historical. We were, but we find that baffling. I mean, if you look at the definition of regular, how can it not be historical? If one is looking through the lens of what is regular – And that's one argument you have, the historical pay to this person. But you have another argument, I think, which is the same formula was used here that the firm – And that was also undisputed. At trial, we made clear that what we paid Mr. Ndimi for these commissions in Nigeria was no different than what we paid every other agent across the company, across the world, who was doing similar projects. I am not a mathematician, but I can tell you, roughly speaking, there was a calculus whereby the formula was that an agent would get a certain percent based on the book price, if you will, and then for every dollar they sold it above that book price, they would get 50% of that. And so that's why the percentage that Mr. Ndimi got may have been higher than some other agents at the company. But no one ever disputed that it wasn't in line or consistent with what the formula was that the company used for every sales agent across the world. So the district court rejected your due process argument. Yes, Your Honor. Saying this is economic regulation, you're an exporter, there was enough here to put you on inquiry notice. Well, if I may, Your Honor, I think what the district court did, I think under Trinity Broadcasting there's really two steps. The one is, is the agency's interpretation plainly wrong? If it's not, we're going to give the high level of deference the agency deserves and accept this interpretation. But the second step, which is very important here and was very important to this court in Trinity, which is whether or not fair, even if we accept that definition or that interpretation, whether or not fair notice was given to the affected party. And in that case they ruled that there hadn't been any definition or notice. Well, that's why I went back to K&R, all right? Yes, Your Honor. To try to just be clear what your position is. And I still need to be clear about this. Your first position is there cannot be any fair notice where the agency hasn't formally promulgated its interpretation. And D, there cannot be any fair notice where your client has a reasonable interpretation of an ambiguous term. And this is where K&R comes in. There's nothing that could have warned your client away from its interpretation? Yes, Your Honor. That's an evidentiary question, isn't it? That's what I'm trying to understand. Well, it would normally be but for the fact that those facts that support that proposition, in this case, are undisputed as they were at summary judgment. In other words, you say the facts are undisputed as to the firm's historical practice, A, generally, and B, with respect to this agent in particular. Yes. And the judge said, well, the term talks about regular, not historical. And the question, it seems to me, if under K&R the question is, was there anything to warn you away, your position is, there was nothing. Right. The government's position is, there was. Right. And so isn't that a disputed issue of material fact? It's not. We can agree that there was a witness who testified that there was some discussions, his name was Juan Fonse, about what Ex-Im expected in terms of commissions. He then qualifies that by saying, gee, he doesn't really remember. And then he clarifies it by saying, gee, I thought all commissions had to be reported. Setting that aside, what SAFCO and K&R partnership and its progeny teach us is that whatever the guidance is that warns you away has to be authoritative guidance. And, again, in SAFCO, the defendant actually received a written letter from a counsel at the agency, literally warning them away from their position that they were taking. And even there, the court said that wasn't enough because it didn't define the commission. And lastly, I know that I'm out of time, but the court itself, and this is why it's a matter of law, said Ex-Im never defined the term regular commissions or issued any guidance. There was no definition of the term. The government cannot point to, can point to no regulation, no statute or otherwise. No authoritative guidance as to the terms mean had ever been issued. The language itself was insufficient, not susceptible to an exact need. It involved a plethora of interpretive possibilities. It may be conceded that the term regular commissions is not susceptible to an exact definition. Ex-Im officials relied on their implicit understanding of the term while refraining from helpfully issuing any guidance. What are you reading now? I'm reading, these are quotes from Judge Urbina. Right, from his first. Yes. And it goes on for another page. I'll spare you that. But he clearly recognized that this was an ambiguous term, and he also recognized that the definition that MWI adopted was one of the three possibilities that he even identified. The term potentially includes all three, referencing the industry-wide, intrafirm, and individual agent thing. So the fact alone that we have a judicial determination that the term is ambiguous and that MWI's interpretation, which is undisputed that it was their interpretation, was among those reasonable possibilities should end the matter there in terms of both on the due process side and in terms of the falsity side before we even get to the scienter side in the KNR partnership decision. And with that, Your Honor, I will unless the panel has questions at this time, I'll just turn it over. Thank you. Counsel for the government. Thank you, Your Honor. The standard, whether at summary judgment or after the verdict, is whether any reasonable jury could conclude on the record that we've made out our case. What about the authority in this circuit, though, that talks about fair notice? If the government is going to move against a party, the party has to have fair notice, and the government can't rely on an ambiguous term in proceeding. I think there are two parts there, Your Honor. The first really is evidentiary. We have to prove that they were on fair notice, that they could have been on fair notice, and we presented evidence to that effect. That's an evidentiary question. If the law is that unless the agency has formally promulgated its interpretation of an ambiguous term, the government can't proceed against it. I do not think that's the law, Your Honor. We do have to show that you're acting outside any reasonable interpretation of that ambiguous term, but that's exactly what we showed to the jury. This is not kind of an in-the-margins-of-reasonableness case. We presented evidence. Well, if there are three possible interpretations of regular in this case, industry-wide, intra-firm, and historical with respect to this agent, it seems like they were within the bounds of two of those three. Your Honor, I don't think they're even within the bounds of two. Their average to all their other, in their firms, was about 10%. These were 33. But even so. They use the same formula, correct? I don't know that that's undisputed, Your Honor, but certainly they yielded wildly varying percentages and wildly varying amounts. The average to all their other agents was 31,000. This guy, the lowest he got on the loan. You know how stats can be manipulated, and it depends on the percentages rather than the amounts, and then you're using the amounts. The percentages were triple what they paid their other agents. It depends on the formula. But it is consistent, at least, undisputed, consistent with what they paid him before in other deals. They certainly had been paying him inflated commissions a long time. But the court found. The problem with the term regular is that it requires a baseline to compare to. Regular is compared to what? Did you spend your regular amount of time preparing for this argument? Regular is compared to other cases where I'm doing two sides of the argument, or regular as to an ordinary case. You know, there's a baseline of comparison, and it strikes me that when you're asked regular commission, it's not unreasonable, or at least arguably not unreasonable for someone to say, well, this is what we've always paid him. That's our regular commission to him. Or this is the same formula we apply to others. Yes, it leads to higher commissions for him, but it's the same formula. It's a regular commission. That is contrary to what the district court said at page 233. I know, but why is it wrong? It's wrong because of the reasons that the former head of Ex-Im testified at trial. If I punch you in the nose seven times, it doesn't make it okay on the seven times, just because I've been doing it to you over and over again, as Judge Urbina explained. It doesn't make it okay, but it might make it regular. It does not make it regular. It does not make it in the regular that any reasonable person looking at this form would have known. We have testimony from multiple sources that anybody in this business would know why they wanted to know about regular commissions and that they knew or should have known that this 33-ish percent was, quote, beyond the pale. And so I don't think Judge Urbina was incorrect to say that from an objective standpoint, a reasonable person considering the term regular commission would recognize that it would imply an industry-wide standard rather than an industry-wide standard. I'm not sure. Why is regular not historical? Your Honor, because if you're looking at this form, you know that what they want to – they don't want to just – Is this your regular way of preparing? Yes, this is the way I always prepare. That's historical. That's common language. Even by their own practices, this was not regular for their whole firm, and we had testimony that not only could they have known, not only was it possible for somebody acting in this industry, but we had testimony from a former Ex-Im employee that says, we had a meeting with Ex-Im. They let us know a reasonable commission would be 2, 3, maybe 5 percent. We all joked in the office about how none of us wanted to sign these things. No, but what I'm trying to focus on is the fact that somebody in an agency says 5 percent is the limit. That hasn't been enough in the past as to fair notice, and I'm trying to understand why this case gets around those cases. The fact that you can put testimony on from various people is not the same as the agency having formally announced what we have in mind is something 5, 10 percent, nothing more. Your Honor, the cases that have said all we're arguing about is a reason. It's like we're all arguing whether your interpretation of this ambiguous term was right or our interpretation. You want to make it evidentiary, and I'm trying to stick with the legal argument that's been made. Was there fair notice of what the term regular commission, what it meant in the view of the Export-Import Bank? Yes, Your Honor. A reasonable person looking at this foreign operating news industry was on fair notice. What industry? The Export-Import Industry, Your Honor. Generally throughout the world? We did have, again, testimony, and how you know what a normal person operating this business is going to know I think is evidentiary, that in any industry the witness could not conceive of a legitimate reason for paying a 33 percent commission, that even 20 was beyond the pay. Well, it depends. It depends, doesn't it, on a lot of different circumstances. It may seem outrageous that we pay, I don't know, sports figures, millions and millions of dollars, and we don't pay school teachers very much or policemen or firemen. All right? It depends what you're talking about and why these decisions were made, and I'm just trying to understand your position because Judge Rufina acknowledged that there was testimony, and I thought you were going to look at K&R where we talked about, you know, were there warnings, which to me implies that the warnings can be something less than official promulgated interpretation. I think that's true in K&R, Your Honor, and, of course, K&R, it said the only evidence there was merely the dispute about the better interpretation. Here, where we have evidence that whatever a reasonable interpretation of this term would have been, we're way outside of it. This is not a case at the margins. We get a chance to make that case. It may be harder for the government to make its case where it hasn't put forth a nice, clean, bright line. We're going to have a harder time convincing a jury that these folks did not have a reasonable, good, safe interpretation and that they acted in accordance with it, but we get a chance to do it, and we did it here. What about the line in the jury instructions that basically said reasonable interpretation does not excuse it of liability? So a couple things. First, they did not object below to that line. Well, the district court cut off the objections after they had put out for different, as I understand it, different proposed instructions. It did not. It's true that the court said, I'm not going to hear argument, but, nonetheless, that same day, NWI put on a docket a notice, just a brief letter, saying, hey, just to be clear, we're still objecting to the loan repayment evidence. They never objected to this language. Moreover, they never appealed on this language again. If you think the jury instructions are on, you ask for a remand. I understand that. They do mention it as part of their overall argument here. In their reply brief, Your Honor, where we never had a chance to talk about it. But let's talk about it now. I don't think that it necessarily is saying what the other side is, the import is describing. The instruction at JA 713 says, you may consider whether or not NWI had a reasonable and or good, safe interpretation of the term regular commission. And then it goes on to say that they may have had such an interpretation does not require you to conclude that they did not act with actual knowledge, deliberate ignorance, or reckless disregard. You can have a good, safe interpretation, even one that we think is way outside the bounds. Say they thought this was 20%. But when they acted, when they turned in these certificates that they knew were not disclosing 33%, you can still act with the requisite scienter. And so I don't think that there's anything per se wrong about this jury instruction. But if there were, you needed to raise it to the district court. You need to preserve that challenge. And then you need to appeal it in your opening brief so we have a chance to fight about it. And you need to ask for a remand. If you think the jury was improperly instructed, the remedy is not therefore throw out the whole case. The remedy is we get to try again with a better jury instruction. And, of course, that's precisely what they have not asked for here. And one possibility is that they may be willing to either pay the $15 million we're asking for in our appeal or get the whole case thrown out, but they don't want to risk us getting to go back and try again and get a much higher damages verdict. Remember, our position is that as the scienter, there was sufficient evidence given Mr. Ponce's testimony, the testimony of other MWI employees and employees of the Ex-Im Bank. Is that your position? Yes, Your Honor. We had Mr. Ponce testifying. We had others testifying that the people in this industry knew or should have known. Now, of course, there was counter testimony. Should have known is not good enough. But knew. I think should have known is, Your Honor. Remember, the statute spells out. It doesn't have to be actual knowledge. It can be deliberate. Reckless. Yeah, reckless or deliberate ignorance. So if you should have known, but you're just closing your eyes and saying, how could we have known? Or as Judge Rubino said, throwing up our hands in vacant bewilderment at what this could possibly mean, that's not good enough. And we have where a client went ahead and asked for an opinion of counsel. That was not enough. How do you distinguish that? Your Honor, again, I believe in Safeco it was a debate about what's the better among objectively reasonable interpretations. We presented evidence and we get to present evidence that no matter where the lines are here, whatever the nemesis, you're acting outside of it. And that's what we did. But I didn't read the testimony to be that, all right? Because you say here today, well what you meant was any international commerce in the world, there never would have been a 33 percent commission. There was no evidence to that effect. I believe Rita Rodriguez, one of the former board members did say And it's not in the Joint Appendix. But it is in her testimony. It's not in the Joint Appendix? Where is it so we can find it? She testified on Did anybody cite it to us? No, Your Honor, but if we want to get into it, we can. It's November 14, 2013. Well, if it's critical testimony. Your Honor I'm just saying, you know, to help the court here. What's the date of the testimony? November 14, 2013, at page 30. She says  I certainly can, Your Honor. Thank you. So she says anywhere in the world, no one for any industry would have given a 33 percent commission. Page 37, she says I don't know of any industry in any country that regularly pays that kind of commission legitimately. She said at page 30. That's a little different, isn't it? Well, Your Honor, again, what we're trying to show I'm just trying to be clear here. Your Honor, let me continue. She testified for the jury that it would have been considered outrageous. She cannot conceive of any explanation that would satisfy that payment as legitimate after her 45 years in international finance and that she has never seen it. It is astounding Astounding to me that if this is critical to the government's argument, that we don't have a cite to it. But I'm going to take your word for what it says. Anything further? I have another question, which is just the things that they cite are as showing that it was a regular commission or at least a reasonable interpretation of the phrase regular commission. The commissions they were paying to the same sales agent for the prior sales for similar projects in Nigeria over the previous ten years, the same internal formula that MDWI used for all its sales agents worldwide, a formula based upon the price the agent made the sale at relative to MWI's internal base price. On that formula question, I asked you that before and you didn't really answer. Were they using the same formula? Your Honor, I don't know whether they were or not, but there was testimony that Was that key? I don't think so, Your Honor. Their own chart that they put in showed that they were regularly paying other agents much, much lower commissions. Again, 9.7 was the average for everybody else and they paid him 33%. And that's because of the way the formula kicked out the numbers. At least that's what they're saying in the brief. I believe that there was also testimony that the base price for these things may be inflated due to non-economic, non-market forces in these types of situations. I don't have a clear answer on the formula. I can try to get one and provide it along with the citations to Dr. Rodriguez's testimony. But whatever formula they were using, it led to this guy getting commissions over three times as high as they were paying their other folks against the backdrop of testimony that they knew, that everybody knew they were violating the rules and just hoped they would never get caught. Well, that's Mr. Ponce's testimony, okay? And they cross-examined him, etc. And he said he thought all commissions needed to be reported. But I guess Dr. Rodriguez's testimony is the key testimony on this. I think Mr. Ponce's is as well. As the district court explained in denying their Rule 50 motion, she said Mr. Ponce also testified that, quote, everybody knew they were violating the rule. So whether or not he himself had a misunderstanding about what commissions had to be disclosed, there was still evidence from which a reasonable jury, again, this court doesn't have to look at the record and think, if I were in that jury room, I would have come out the other way. The question is, is there sufficient evidence such that no reasonable jury could possibly find them liable under the False Claims Act? And you think this line in the jury instruction we just ignore in thinking about that? No, I think, Your Honor, that it properly recognizes you can have a good-faith interpretation, but it doesn't necessarily mean that you don't depart from it when you act. Again, you have to have acted with the requisite standard. But if you think that, again, 20 percent, again, we think that's wrong. We think that's outrageous. But if you have that good-faith interpretation, and remember, a lot of the fight here, a lot of the conflicting testimony was, what did they actually think a reasonable, a regular commission was? But then you depart from that when you act, when you hand in these certificates, of course you can still be liable. And, again, if they had wanted to have this fight, the time to do it would have been to object to this below and to raise in their opening brief so we could actually brief this question. And part of the problem here is we're not just apportioning liability for some set of damages in a typical civil tort case or something. This is a civil penalty provision, quasi-criminal provision, so elements of fair notice really kick in, I think, with a false claims act in a way that they might not with a tort case or something. And that's why I think there's a concern about using a phrase like regular commission, not defining it and coming in years later and defining it in a way where I would have thought historical is fine, regular is historical. Yeah, maybe I've constantly been doing it in a way that I shouldn't be doing it, but you asked, is it my regular practice? Yes. Well, Your Honor, we got to have a fight about that in front of a jury. Again, the head of the company sat up there and testified, I had no idea. I had no idea. I thought this was regular. And we presented counter-testimonies that said, no, you didn't, that you had the same concern that no one wanted to sign these because we're all worried about getting caught. We had a fight about that, and the jury went away. Is this inconsistent to think that what you're doing is proper but also to be concerned? Your Honor, Mr. Ponce's testimony was, we all knew we were violating the rules. But Mr. Ponce had an incorrect understanding of the law. But he testified that everybody knew, and that's what Judge Kessler pointed to in denying her motion. Again, that was a fair ground for them to try to impeach his testimony on, and the jury didn't buy it. And there's no reason that this court should come in and disregard Mr. Ponce's statement that everybody knew that we were violating the rules. But he didn't know the rules. But he said everybody else did. Everyone knew we were violating the incorrect rules. Everybody knew. I mean, he's talking about whether this is regular or not. And he said, yes, did you have discussions with people about what would happen if Mr. Ndimi's commissions had been disclosed? And he said, yeah, we had those discussions. And he said, well, let me just say, everybody just hoped we wouldn't get caught. So he testified as to the actual knowledge. Because if it had been disclosed that they were paying these commissions, what happens then? How about a False Claims Act, Your Honor? False Claims Act. Because you have made a knowing misrepresentation that is material to the government's decision to pay you $75 million. If you're not paying a regular, you're saying they'd have to pay a lower commission. That's the point. I think they probably would have just been, we had testimony, they would have been just denied outright. If they wanted to try to reformulate the deal, get Mr. Ndimi a commission much more in line with industry standards. Mr. Ndimi would say, why don't you pay me my regular commission? That's between FWI and Mr. Ndimi. There are no further questions. All right. Counsel for the relator, Mr. Purcell. Good morning, Your Honors. Joseph Veronica from Duane Morris on behalf of the relator, Robert Purcell. MWI did not argue today the reversal of Judge Urbina's denial of their motion to kick out the relator, but I'm here to address that. They filed that motion ten years after the case was filed, after the government had intervened, and one year after the initial rulings on the motions for summary judge. The motion that they filed was based primarily on a Miami Herald article in May of 1998, reporting on a lawsuit filed by Robert Purcell against MWI on some contract issues after his termination. Is that the official one, the article that's at J271? This is May 25th, 1998? Yes. Okay. That's the one. The district court, after analyzing the article and the relator's complaint, denied the motion. There's no reason to disturb Judge Urbina's well-reasoned opinion and his factual findings that Mr. Purcell's lawsuit was not based on that article or any other article. Well, that's not quite the test, is it? I mean, the question is, you know, were the facts disclosed such that the government could proceed with an investigation, and even if they were, was Mr. Purcell nonetheless an original source? Well, I think there are two aspects to this. First, you determine whether or not the allegations and the transactions in the relator's complaint are based upon any public disclosure. If the judge were to find that, then the judge addresses the second part of the test, and that is, is he the original source and when did he file it? Judge Urbina decided there was no public disclosure upon which the allegations and the transactions in his complaint were based on, and he was absolutely correct. The article deals primarily with Jeb Bush's relationship with David Eller and Bushell and MW Lott. The article was published around the time that Jeb Bush was running for governor of Florida, so we've had a lot of play. MW Lott bases its argument in large part on one paragraph, and that paragraph is in statements linked to the lawsuit. That's the state lawsuit that Purcell filed. Purcell alleges a laundry list of possible, quote, fraudulent, quote, activities, quote, including cash payments for influence and bid rigging. He also alleges that Eller reimbursed employees for making political contributions to unnamed candidates. The information, obviously, in that article came from Purcell, and the reporter says that. But those things were shot down by Bush, by Eller, and by Eller's lawyer. No, I guess that's not the question, though. I mean, obviously, Mr. Bush is not at issue here in any way. But rather, it's a question of whether the article referring to the $74 million sale, financed by the Export-Import Bank involving this water pump company, that profits were being diverted, and that Mr. Inouye, you know, was the recipient here. No, that's just not correct, Your Honor, with all due respect. The article does not say that. What does it say? The article speaks about a contract, the Ex-Im contract, with that money. The diversion related in Purcell's losses is that he believed some of the monies that went to Bushell for commissions, he was entitled to. No, I understand that. But all I'm saying, the question is, did it put the government on sufficient notice to pursue an investigation? Absolutely not. And because? Because that only related to after MWI received the money, how it was distributed. It didn't deal with any fraud on Ex-Im or any government agency on how MWI derived and received that money. That's the distinction. And when you take a look at the complaint, Mr. Purcell's related complaint, that deals and alleges that MWI perpetrated a fraud on Ex-Im. There's no mention in the article of Indemi as MWI's agent. There's no information that Indemi received over $25 million and over 30% of the funds that MWI got from this Ex-Im loan. There's no mention of MWI filing false certifications with Ex-Im to cause the loans to be paid. There's no mention in the supplier's text. Supplier certificates that were filed were false because MWI lied when it said it paid Indemi only regular commissions. That is, that the commissions he received were in line with the commissions that it paid to its, in the ordinary course of its business, to its regular agents formally. That's, and as an aside, that's what the supplier certificate says. The supplier certificate just doesn't amorphously speak of regular commissions. What it says is you've got to disclose commissions that are other than what you pay in the ordinary course of your business to your regular agents plural. Just because MWI might have gotten away earlier with fraud than the amount it was paying Indemi years before, doesn't give them the right to claim that all of a sudden that's a regular commission when they got around this contract. The newspaper article doesn't say anything about false certificates of value that were filed with Ex-Im, which claimed no commissions were paid. There's no mention of the false onboard shipping documents which claimed no commissions were paid. There's no mention that MWI knew the various certifications were false, that they intended Ex-Im to rely. And there's no mention of MWI's deceptive equipment descriptions to avoid price comparisons in order to conceal the gross overcharges for the, between 200 and 500% of price gouging on the Nigerians. And that was done in order to get this approved. All right. Thank you. I think we have your argument. Thank you, Your Honors. All right. Counsel for MWI. Yes, Your Honors. First of all, as to the issue of the jury instruction and the objections, I think the record speaks for itself. I'll just note that in our pretrial statements, we both, both sides proffered their proposed jury instructions, objections to the others. Judge Kessler then heard a series of motions in limine, asked the parties to submit new objections, or new jury instructions, which we did, as well as objections to the government objections. Then during the course of trial, she had submitted her proposed instructions. We submitted some additional authority, and I think as the record makes clear, she made clear that she wasn't going to hear any more objections from that point forward. We think that issue is preserved, but the point is an important one. Well, I think the issue is whether it's forfeited, because you didn't raise it in your opening brief. Yes, Your Honor. I mean, in our view, the issue doesn't even really relate to Rule 15. I understand that. You don't want a new trial. Yes. It's like Roberto Duran, right? No, Your Honor. And what I would also say is this industry standard thing, you know, it goes back, we did get into a Kafkaesque kind of circumstance where the government pushed it, never put on any evidence of what the industry was, and then the court said in Rule 50, gee, of course, they couldn't have put any evidence on of an industry standard, because in Nigeria, it was an industry of one agent, Mr. Ndini. What about Ms. Patterson's point that there was common knowledge that this was pushing the envelope? There just really wasn't, Your Honor. And the fact that the only evidence really, as Judge Rogers pointed out, was the testimony of Mr. Ponce, which I think. . . Well, we heard about Dr. Rodriguez this morning. And that's a fair point. And what I would say is when you read the testimony of Dr. Rodriguez, she went on and on about how no one could imagine a commission above a certain percentage or certainly nothing in the 30s, blah, blah, blah. What Ms. Patterson failed to disclose, though, and what the testimony does is that on cross-examination, Ms. Rodriguez actually revealed or conceded that Export-Import Bank pays its own insurance brokers a 40% commission. So, you know, I think Ms. Rodriguez's testimony can be undercut in that regard. And we also submitted at J748. . . And what's your best answer to the Ponce testimony? Is that Mr. Ponce's recollection was poor in his understanding that the law was wrong. And as Your Honor pointed out, if he says, gee, everybody knew, it's kind of like him, based on that concession, saying everybody knew that we may have been doing something wrong against this misguided notion or misapprehension of what the law could be. And this was a chart that shows in its JA748, which was the historical commissions of Mr. Indini relative to MWI. And, I mean, graphically, I think it shows that they didn't change anything when we got to the . . . The blue part is the deals that are in question. And I think Ms. Patterson would say that just because it had been done inappropriately before . . . Sure, the government's position is that, gee, if you historically bribe people or historically pay inflated commissions, then I don't know if she would concede that may be regular. We wouldn't. She would say it's not, I think. I think that's what she said. So how do you respond to that? Yeah, what we would say is that this was the market. As the court recognized inferentially in the Rule 50 decision, that Nigeria, we had one agent. We had been doing these deals for a long, long time. Why would we pay him something different? And we didn't on this particular deal versus what we had paid him in the past. And the evidence is uncontroverted that we didn't. And I think that we can . . . Is this . . . Yes, Your Honor. Does the evidence show that that was also true with regard to EXIM bank loans? Yes, Your Honor. There was actually one. We had a significant deal, the River Basin Development Authority project, back in the mid-1980s, where we paid Mr. Ndimi the same, if not a higher commission, and we filled out the same types of supplier certificates, certifying the same exact thing. That was 10 years earlier. We filled the form out the same way. And as to the point, if historical does not mean regular, I just don't know what could. And again, that goes back to the notion that EXIM should have said so. And lastly, there's the issue of Mr. Glick, who is the general counsel for EXIM, who actually wrote the language in the certificate. And he testified at trial. And he testified very clearly at 661 through 683 that . . . He testified clearly that he had been, first of all, at EXIM from 1955 through 1984. He was the one that wrote the applicable language. Question. So regarding commissions, as you drafted the commission certification, and the supplier certificate was meant to apply to the exporter's commission for the exporter who was filling out the form. Correct. Correct. He also said that if an exporter had a sales agent that it had used exclusively in a particular market for roughly 10 years and paid him or her a commission consistent with and in the range of what it had paid him or her on numerous transactions during that 10-year period, would it have been reasonable for the exporter to believe that those commissions were regular commissions? It would be reasonable is his answer. And it goes on and on. And we wrote down the certificate phrase by phrase. And, in essence, whether NWI's interpretation was reasonable. He said it was at every turn. He also said that it was never intended to apply an industry-wide standard, that it was always intended to apply to the individual company filling out the form. And, again, he's the person who authored the actual certificate. And I understand that his view of the world may have been different than the litigation, fresh post-hoc rationalization that the Department of Justice provided. But, nonetheless, it all goes back to the point. At the end of the day, this was in. There was not fair notice of this standard in violation of due process. As defaulted as he entered, the term was clearly ambiguous. The district court recognized that. It also recognized that NWI's interpretation was among the reasonable interpretations the company could have. And there is nothing disputed about the circumstances that I've described for you. And that's why we needn't get to the Rule 50 motion issue at all. This all goes back to summary judgment. These were pure legal conclusions that judges were being reached. The facts involved were undisputed. The case never should have gone to trial. There's nothing at trial that changed any of this. There was never authoritative guidance of any sort that warned NWI away. Just lastly, I would say on a policy level, and, as you know, we have an amicus in this case, the National Association of Manufacturers, this case is the epitome of why we need bright lines. It is fundamentally unfair to deprive an individual or a party from property or a liberty interest when you don't provide fair notice. There is no dispute, Your Honors, as to whether or not fair notice was provided, whether or not the provision was ambiguous, and whether or not NWI had a reasonable interpretation. As to the public disclosure issues, we'll rest on our written submissions. All right. One quick question about the record. This supplemental record filed under seal? Yes, Your Honor. That's accompanied by a filing of May 28th of this year. Is it my understanding, this is NWI's notice of sealed supplement. Yes, Your Honor. Is it my understanding that the pages in this document are not sealed? May I confess momentarily? Maybe if you could just alert or, you know, advise the court. I wasn't clear whether these pages were sealed because they were subject to protective order or these pages are not sealed because they were not subject to the protective order. If I may defer to my colleague. That's fine, yes. Thank you. Thank you, Your Honor. Just to address that, there's no content in the pages that is, in our view, subject to the protective order. However, the entire filing from which those pages emanate was filed under seal. So what I'm trying to clarify in my own mind is this was submitted by all three parties. But the document labeled under seal. But only NWI filed this explanatory statement. And I read that to mean that these particular pages were not subject to the protective order. Am I correct in reading that that way? Or is it just your interpretation that the protective order didn't reach the facts or proceedings in these particular pages? Well, the protective order was entered at NWI's behest. And on behalf of NWI, our position is that those particular pages do not contain any protected information and, therefore, we're not subject to it. All right. Thank you. Mrs. Patterson, is that the government's position as well? We defer to NWI. It was a protective order for their benefit. So if they're comfortable with it, we're fine. Thank you. Any further questions? All right. We'll take the case under advisement. Case is under advisement.
judges: Rogers, Brown, Kavanaugh